Matthew Jacobs of the law firm of McDermott, Will and Emery, along with David Alexander. And I have a different plan for this work than I possibly thought. And I would like to reserve three minutes for rebuttal. Your Honor, the immigration judge's adverse credibility finding here was based on impermissible grounds. First, he relied on conjecture and speculation, not facts. Second, he focused on minor inconsistencies that did not go to the heart of the asylum claim. Third, Mr. Avagyan was not given the opportunity to explain these alleged inconsistencies. And in the instances where he did provide some explanation, the I.J. simply ignored those explanations in his decision. And fourth, and most troubling, the immigration judge in this case repeatedly misstated the record and on various occasions attributed statements to Mr. Avagyan that, in fact, he never made in his testimony. And then he relied on those statements for the finding of adverse credibility. This Court must consider the three grounds cited by the immigration judge as the basis for his adverse determination. None of those findings were based on substantial evidence. They were, first of all, silence in a hospital report about the extent of injuries to Mr. Avagyan's mouth. Secondly, a photograph that showed Mrs. Avagyan smiling. And third, Avagyan's participation in a political protest after being tortured the first time. So I'd like to talk first about the silence in the hospital report, the first issue. This case, Your Honors, is very similar to this Court's decision in Singh v. Ashcroft at 301 F. 3rd, 1109. In the Singh case, the petitioner was arrested just like Mr. Avagyan and beaten. And he provided, along with his testimony, a corroborating note from a doctor that described injuries to Singh's lips, nose, feet, and groin, but was silent about burns on the arms. And the immigration judge found that that was an inconsistency to Singh's testimony. This Court found that silence in a doctor's report was not inconsistent or incompatible at all, and, in fact, stepping back, Singh had injuries all over his body corroborated by the doctor's note. Very similarly here. Let me interrupt you because we've read the brief, Mr. Jacobson. Let me take the opportunity to congratulate you on making a good case where so often we have people representing asylum seekers who do a very poor job, but you've done a very good job. Thank you. But my problem, I'll put it to you directly, is that the standard is very high. We must feel compelled to reverse the credibility finding. And when I look at that hospital report, I first of all notice he was discharged in one day. He says I was in there three days and discharged on the fourth. That's a fairly substantial discrepancy, perhaps. Secondly, he says, well, they didn't do dentistry, so they didn't mention it, but they advised him to consult a neurologist. So they're obviously giving advice as to people not in the hospital. Why wouldn't they say you must see a dentist? Now, those are things. You cite the same case, and of course that helps you. But credibility determinations are exquisitely judgments of fact addressed to the person on the scene. You know, the judge is looking at this man, thinking, is he making it up? And so those are my problems. Let me address that, Judge Newton. First of all, I think on the standard you're obviously right that there's some deference to. But I think that the. . . You say there's some deference of statute on it. Yes, absolutely. But there's also the case law of the circuit that the I.J. must present specific and cogent reasons for each credibility determination. Right. And that this Court will not blindly accept the credibility determination made by an I.J. So I think on the standard, it is clear that this Court should review those, the credibility determination in detail. And not only that, but where, while factual determinations of credibility certainly deserve deference, if the I.J. is acting contrary to the law of this circuit, which I believe the I.J. did here, that does not – that is not entitled to deference. Let me address the specific factual questions that you've raised. First of all, the discharge of one day after three days appears to be a discrepancy. Four days. You're discharged on the fourth day. Yes. That was not cited specifically by the I.J. No, it isn't, but I'm just looking at it and thinking, well, we have to decide how credible this man is in a way. Well, I think under the Marcos case, it's – we're limited to review of what the I.J. relied on. And he did not rely on the – this discrepancy between one day and four days. But I think stepping back, the hospital report – Mr. Vagin testified that he was – that he was beaten. The government doesn't dispute that. And there's nothing in the record that disputes it. And it's corroborated by a hospital report. The hospital report, as you know, at page 86 of the record, describes injuries all over Mr. Vagin's body. So I would submit that even putting aside the mouth injuries, it doesn't go to the heart of the asylum claim, because it's clear that just like in Singh, Mr. Vagin was, in fact, substantially injured. And there's no other explanation in the record other than that he was beaten and tortured by the authorities in Armenia. I think the I.J. in this case, for six independent reasons, violated the law of this circuit with respect to this mouth injury question. First, it was based on speculation about what a doctor in Armenia might or might not put in a hospital report. Second, he relied, again, on silence in the medical report, which is against this Court's precedence in the Singh case. Third, he never addressed the corroboration point that Mr. Vagin did when he was released from the hospital to seek treatment at a dental clinic. And it's undisputed that Mr. Vagin also lost 15 teeth. Fourth, as indicated, I don't believe it goes to the heart of the asylum claim because it's not a — it was not an attempt to bolster his own — His own — You know, on the teeth, let me bring this difficulty up. He tells his American dentist that it was an accident. And he also testifies that the dentist X-rayed him and found a fracture in the mandible. I didn't — I may have overarched it, but I didn't see anything in that dental report that spoke of the X-ray. That's correct, Your Honor. It doesn't speak to — it doesn't speak to a fracture of the mandible, which I would submit does not go to the heart of the claim. What's clear is that Mr. Vagin lost 15 teeth. Well, he lost them some way. We don't — on the chart, it says lost or replaced teeth. Are those — the top row that's sort of blacked out, are those the missing teeth? Looking at the chart. I assume that's correct, Your Honor. You know, I know you didn't handle the case before the IJ, but that document and the hospital document were not terribly helpful to Mr. Gagnon's case. I understand that. But I would submit to the Court that while the IJ dwelled on this dental note, first of all, it's not clear from the record that Mr. Vagin actually said it was an accident. Well, that's what he reported, anyway. That is what the IJ reported, which is actually misstated. No, I mean, that's what the dentist reported. Well, the dental report says it, but whether Mr. Vagin said — Mr. Vagin actually — We don't know. But it's just a report of what he's — what the dentist at least remembered he said. Mr. Vagin said he said that he suffered a blow. Right. But even if he said accident — I mean, okay, fine, he said accident. It's two years later. He's with a dentist he's never met before. It's not relevant. Well, of course, you can — you do and you have offered explanations. The question is, since there's more than one explanation, are we compelled to find the IJ's conclusion erroneous? I believe that you are. Under this Court's decision in Chen, it is not substantial evidence if the IJ failed to consider every plausible and reasonable explanation. And in this case, the IJ took every fact that was ambiguous. The mother smiling. Was she smiling for this reason or that reason? The accident. There are other explanations. He took those and interpreted those against Mr. Vagin, acting, as Your Honor said in the Lee dissent, as a prosecutor, not as an independent judge. I would like to reserve the right. You'll have a minute for rebuttal. Thank you, Your Honor. Hear from the government. Good morning, gentlemen. May it please the Court. My name is Rosemary Simota Thompson, and I'm an attorney for the government. On the basis of adverse credibility, the immigration judge, as we know, denied Petitioner's claim for asylum. The decision, as we also know, was adopted and affirmed by the Board of Immigration Appeals. I submit to you, gentlemen, that the legal remedies available to the Petitioner have been exhausted. And he seeks relief from this Court. Your Honor, Mr. Vagin was given a fair shake by the system. He has had his matter before, counting today, three courts. He has had his notice. He has had his asylum interview. He's had multiple continuances. And he's been represented by counsel. He has had a fair shake from the government, and his due process rights have been preserved. I'd like to remind the Court, with all due respect, that the Petitioner bears the burden that, given the heavy burden that the Petitioner carries, that based on adverse credibility, he has not met his burden. Can I ask you about that question that the I.J. asked about his being fed in droplets? Yes, Your Honor. Where did that idea come from? I'm glad you mentioned that. I would draw your attention to the Petitioner's first brief. On page 8, the appellant, and I quote, the appellant stated that during his hospitalization, his face was so swollen that he had trouble eating and had to be fed by a straw. Now, is he fed in droplets? Is he fed by a straw? Keep your voice up. I'm sorry. Did you hear that last point? Just speak into the microphone. You do well. Better? Much better. Okay. Let me repeat that point because it's an important one. On page 8 of the Petitioner's appellate brief, and I quote, the appellant stated that during his hospitalization, his face was so swollen that he had trouble eating and had to be fed by a straw. Your Honors, I submit that if it's a straw or if it's droplets, it's a distinction without a difference. But where is that in the record? Those exact words, what I just cited, that's page 8 of the ER. Where is it in the record? Page 8 of the record. Of the ER? Of the Petitioner's appellate brief. I'm asking you, where is it in the ER? Testimony before the IGF. Testimony. I've looked at this. Oh, I'm sorry. I'm sorry. The Petitioner did not use those exact words. No, he didn't. So let's get it right. Where did the IJ get the idea they were droplets? Okay. The IJ, I think he found Petitioner to be a difficult witness. What's that? He found Petitioner to be a difficult witness. Just keep your voice to the microphone. I'm sorry, Your Honor. He found the Petitioner to be a difficult witness, and who often would seek to draw him out by examples. I can cite several. It was his style. Let me see if I can find the ---- You know, let me tell you this frankly. May I tell you something? Yes, Your Honor, please. I've developed some doubts about the accuracy of the transcript. The first question is, could you eat? And the answer is, I couldn't work. Right. Is that the answer? It seems to me it's probably a mistaken translation. And the government, I think, bears the burden of getting an accurate translation. And then there are several indiscernibles, and there are several ---- at least one point where there seems to be a gap in the whole thing that just goes on. I'm just wondering whether we should send it back to get a better transcript in a new hearing. There were difficulties, Your Honor. There were difficulties, Your Honor. And I can ---- I submit that that's why the judge tried to draw Petitioner out. No, but he made up what in any ordinary cross-examination would have been said to be a multiple question, many different parts to it. And so if there had been an adequate objection, it would have been separate those judge. I have the impression that he must have heard. I don't ---- Did he really make up that feeding by droplets? Going back to that, Your Honor, this is an example of what I was trying to explain, the I.J. seeking to draw Petitioner out. No, but did he make up the droplets? Please, if I may, on page 120 of the record, the I.J. stated, again, trying to draw Petitioner out, so he walked into the hospital from the prison. You couldn't open your mouth to drink. You had to be fed in droplets. Your face was swollen. All of this was obvious when you went to the hospital in November of 2000. Is that right? Petitioner answered, yes, in November. I could take care of my teeth in December. I submit that the I.J. was seeking to draw Petitioner out, and Petitioner agreed with the I.J.'s assessment. If I may, Your Honor, I'd like to talk a little bit about some of the comments the gentleman before me made with regard to silence. As you observed in the hospital report, there are many discordant aspects of this case. We submit that the Petitioner's adverse credibility decision against him came from three things. The hospital report, as you discussed, the family photo, which I would like to draw your attention to a quote from the record, which says, the Petitioner says, quote, I photographed the whole body of my son. Quote, I photographed the whole body of my son. It is on page 91 of the record. And if you compare the family photo with the record, you see a family together. You see a young man in full military regalia. There is no trace of torture, abuse. It's a simply discordant exhibit. It does not jive. That struck me when I read the transcript. Yes. I looked at that photo. It seemed as though it was just a photo of his son. Yes. Not that the family photo was just a photo where they could identify the son and that there was a different photo, a different photo or document referring to the body of his son. They didn't match up. Exactly. Exactly. And the final point, as you mentioned, was the ---- The family photo was the one that was intended to be a photo of the body. That's the Petitioner's testimony, Your Honor. And that's ---- Can I return to your quote? I just had a chance to look at page 120 of the record. You say the judge was trying to draw him out. Absolutely. If the judge imagined the various statements, that's certainly more than drawing him out. I didn't hear you completely. If the judge imagined these things, the judge makes a quite an elaborate statement, which he's not testified to. Your Honor, I'm sure the judge got that from the brief, which stated on page 8, his teeth were knocked out during the beating and his cheekbone was fractured due to repeated kicks in the face. His testimony is they were loosened up and they fell out eventually. Yes. He's testified in several ways. He's testified they were broken. He's testified they were out. And he's testified that ---- It's not a question of the translation. I think if you follow along, it's pretty clear. He said, yeah, I suffered a blow and they were loose. And then later on, some of them had to be replaced. True. That was his testimony. But it's also ---- It's not the way the ---- Your mouth was so slow and you couldn't open your mouth to drink. Where do you say that? Where did the witness testify to that? I ---- Your Honor, I have slide 8 that says he has ---- What's that? On page 8, it says he has trouble eating. I don't remember referenced ---- Drinking. I don't remember. I don't believe it was ---- Don't know it. And it isn't there. But doesn't it go to swallowing? Imagination on the part of the IJ. With a difficult witness, I think he was trying to do the best job he could, Your Honor. There are several other examples. Imagination. May I share the other examples? The IJ, with a difficult witness, when he would have a nonresponsive answer, the judge would say something like, here, on page 89, trying to ascertain where Arthur was after a nonresponsive answer from the petitioner. The IJ said, where was he? Was he located in St. Louis, Missouri, or Japan? And that was simply his way of trying to bring the petitioner out, to get the petitioner to be responsive to his questions. It was a matter of his style, Your Honor. Well, that's not style. It was his language ability. Right. That was a pattern. There were several other patterns. And, again, in good faith, the IJ, when we had the accident comment with regard to the mandible, the IJ said to the petitioner, yes, but what's an accident to you? So he gave him an opportunity to explain if there were cultural differences. If he did explain that he said it was a ball, and the dentist interpreted it as accident. Yes. He also said he didn't do that. That's not surprising that an American dentist doesn't expect a ball means torture. I submit, Your Honor, if I go to a doctor, I give the doctor the facts of my condition. I found it surprising that the petitioner did not, considering his discussion of the mandible, which was fractured, which was never, ever validated in the record. That goes to the gravity of this argument. That goes to the heart of the argument, because it talks about the gravity of the petitioner's injuries. You know, he didn't even testify to these injuries on direct. It was only as the government developed, these things emerged. And then as the IJ expanded on them, imagine it, everybody. I submit, again, to Your Honor, that was the particular style of the IJ in seeking to draw a petitioner out. And you keep saying draw him out, but a judge can't draw somebody out by imagining what he's testified. He was seeking to have the petitioner respond. The petitioner was an extremely difficult witness, and the IJ jumped in. He made up a few things. I wouldn't say he made them up. He would be seeking to clarify petitioner's testimony. The petitioner was sometimes vague, and the IJ was attempting to clarify the situation. And if he made any error, gentlemen, Your Honors, I concede, I submit, rather, that it was harmless. That it was harmless. The gist of this case is the contradiction between petitioner's testimony and petitioner's documents. The two things together don't gel. The evidence does not support. And under the words of Elias Zacharias, the evidence does not compel an adverse decision to — excuse me for fumbling. This is my first oral argument. But the — under the teachings of Elias v. Zacharias — pardon? There's a statute that incorporated Elias. You don't need to tell us about it. I don't need to educate the Court. All right. Thank you, counsel. We appreciate your — you have one minute of rebuttal. Thank you. I'd like to make four brief points in rebuttal. First, the question is not whether, as counsel says, Mr. Vaughan got a fair shake, but whether the IJ followed the law. Second, under this Court's precedence in the Ockenmaid case and others, grammatical misunderstandings or mistranslations cannot be the basis for a finding of adverse credibility. And I would submit that that's what happened in this case. Third, the — there are other instances in the record that I'm sure the Court is familiar with, but would just like to draw the Court's attention to, in which the IJ misstated the record and Mr. Vaughan's testimony, particularly as it related to his son's Arthur — Arthur's injuries. At page 114, the IJ found that Arthur bared no apparent bruises or injuries or signs of abuse. In fact, Mr. Vaughan never testified that his son had bruises over his face. What he said is he had internal injuries that he — his son told him he had inflammation of the lungs and the kidneys and that he had difficulty urinating. So it's not surprising that his son would not bear injuries all over his face. And I could add to that that the IJ says that the photograph doesn't show internal injuries. Yes. It's really amazing that you would expect internal injuries to appear on the external. Agreed, Your Honor. And so just in summation, we would request that the Court send this matter back to the immigration judge for determination about whether or not he feared a reasonable fear of persecution, and we would specifically request that it go back to a different immigration judge. Thank you, Your Honor. Thank you. The matter will be submitted.
judges: Canby, Cox , Paez